IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


ANDERSON V. ANDERSON


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


MICHAEL D. ANDERSON, APPELLANT,

V.

STACIE L. ANDERSON, APPELLEE.


Filed July 24, 2018.    No. A-17-894.


Appeal from the District Court for Douglas County: LEIGH ANN RETELSDORF, Judge. Affirmed.

Lawrence G. Whelan, of Whelan Law Office, for appellant.

Benjamin M. Belmont and Wm. Oliver Jenkins, of Brodkey, Cuddigan, Peebles, Belmont & Line, L.L.P., for appellee.


MOORE, Chief Judge, and ARTERBURN and WELCH, Judges.

MOORE, Chief Judge.

## INTRODUCTION

Michael D. Anderson appeals from the order of the district court for Douglas County, which dissolved his marriage to Stacie L. Anderson. Michael assigns error to the court's decisions concerning parenting time, child support, and Michael's ability to claim a tax dependency exemption, as well as the court's denial of his motion to alter or amend the decree of dissolution. Finding no abuse of discretion, we affirm.

## BACKGROUND

Michael and Stacie were married in April 2004. They are the parents of two children, who were born in December 2007 and August 2010, respectively. The parties separated in March 2016 when Michael moved out of the family residence.

On March 11, 2016, Michael filed a complaint for dissolution of marriage in the district court. Michael sought joint legal and physical custody of the parties' children or, alternatively, sole legal and physical custody; the calculation of child support pursuant to the Nebraska Child Support Guidelines; and an equitable division of the marital estate.

On March 30, 2016, Stacie filed an answer and counterclaim. In her counterclaim, Stacie sought joint legal and sole physical custody of the parties' children, as well as child support and an equitable division of the marital estate.

The parties both filed motions seeking temporary awards of custody and child support. Specifically, Michael's motion included requests that the district court grant him "joint temporary and permanent" custody, or alternatively, sole legal and physical custody of the parties' children; determine temporary child support; and order the parties each to pay a portion of the children's nonreimbursed health care and other expenses. Stacie asked the court to grant her joint legal and sole physical custody of the children and temporary child support and to order Michael to contribute toward the children's nonreimbursed health care expenses.

Apparently, the district court made certain findings regarding the temporary issues at a hearing on May 26, 2016. Those findings are not included in the record on appeal, and a temporary order was not entered until September 6. However, testimony from the dissolution trial shows that the parties operated under a parenting time schedule between the May 26 hearing and entry of the temporary order. Under the pretemporary order schedule, Michael had parenting time every Tuesday and Thursday, including both overnights, and then every other weekend. Michael's alternating weekends under the pretemporary order schedule began on Thursday of the relevant week, and ended on Sunday at 7 p.m. Stacie filed a motion on August 2, seeking clarification with respect to parenting time during the school year, and following a motion to enter order filed by Michael, the court entered the temporary order on September 6. In the temporary order, the court awarded the parties temporary joint legal custody with Stacie having primary physical custody of the parties' children. The court set forth the following parenting time in a 2-week block schedule:

> In the first week, [Michael] will have parenting time Tuesday overnight to Wednesday morning, Thursday from after school to [8] p.m., and alternating weekends from Friday to Sunday at 6:30 p.m. [Michael's] parenting time on Tuesday, Thursday, and alternating Friday[s] will commence after school, or when he picks the children up from daycare if school is not in session.

> In the second week, [Michael] will have parenting time Tuesday and Thursday from after school, or when he picks the children up from daycare if school is not in session, and ending the following morning when he returns the children to school or daycare if school is not in session.

The court also ordered Michael to pay temporary child support of $538 per month, commencing June 1.

Trial was held before the district court on April 21 and May 8, 2017. The court heard testimony from witnesses, including both of the parties and a CPA retained by Stacie's attorney to determine Michael's cash flow, and it received various exhibits, including proposed child support calculations, copies of income tax returns, and Michael's monthly expenses.

Michael is the self-employed owner of a lawn care company, Jolly Green Lawn Care (Jolly Green), and a tree care company, Out on a Limb. Jolly Green is a sole proprietorship, and Out on a Limb is an "S Corp." Shortly before trial, Michael bought out his partner's 50-percent interest in Out on a Limb and became the sole owner of the company, although "the final documents" for that transaction had not yet been signed at the time of trial.

Michael receives income from both companies. In 2016, Michael received a salary of $10,241.55 and draws of $8,800 from Out on a Limb. Michael does not receive a regular salary from Jolly Green; rather, he "take[s] draws when necessary" and "pay[s] whatever [he] need[s] to do, pay just out of that account." At trial, Michael submitted a proposed child support calculation attributing to him a total monthly income of $2,296.50. He claimed that this amount was based on his income tax returns after taking "the deductions for the various business expenses" into account.

The parties' joint income tax returns for 2014 and 2015 were admitted into evidence. The 2014 return reflects "Nonpassive income from Schedule K-1" for Out on a Limb of $7,114. For Jolly Green, it shows "Gross receipts" of $46,627, "Total expenses before expenses for business use of home" of $43,932, "Expenses for business use of . . . home" of $950, and "Net profit" of $1,745. When the "Depreciation" of $10,559 is added back to the "Net profit" amount, the total is $12,304. The 2015 return reflects "Nonpassive income from Schedule K-1" for Out on a Limb of $11,056. For Jolly Green, it shows "Gross receipts" of $52,980, "Total expenses before expenses for business use of home" of $45,580, "Expenses for business use of . . . home" of $1,111, and "Net profit" of $6,289. When the "Depreciation" of $10,213 is added back to the "Net profit" amount, the total is $16,502. Michael testified that he did not have a 2016 tax return available yet. He estimated that he earned less from his businesses in 2016 than he did in 2015, as a result of buying out his partner in Out on a Limb and the increased cost of contract labor to allow him to spend more time with the children. He estimated that he earned "about the same" in 2013 and 2014 as in 2015.

On cross-examination, Michael was asked whether he deposits "all of the monies that [he] receive[s] mowing lawns from Jolly Green." Michael agreed that "[e]very once in a while" he gets some cash, and he testified that he does not deposit any of the cash. He also agreed that he cashes some checks he receives at the payor's bank and that those checks would not be reflected in his receipts. He agreed that no evidence had been submitted to show "cash numbers" or the amounts for any checks cashed at the payor's bank. But, when asked if a review of the "Gross receipts" amount on the tax returns would accurately show how much he earns at Jolly Green, Michael testified, "It will be very close."

Michael was also questioned on cros-examination about various financial documents on which he had documented claimed income. On a personal financial statement he signed in June 2014, he indicated that his total annual income was $60,000. Michael testified that this figure reflected his gross sales that year for Jolly Green. In 2013, Michael claimed a gross monthly income of $6,041.00 from Jolly Green on a loan application. At trial, he explained that this figure did not include business expenses. On another loan application, completed in 2014, Michael claimed gross monthly salary of $5,000.

Michael offered an exhibit, which was received by the court, showing his "MONTHLY LIVING EXPENSES" totaling $7,365.15. This total included a land payment of $2,036. Michael

represents in his brief on appeal that the land payment amount listed is actually the yearly, rather than the monthly, amount; an error he did not notice "until the conclusion of trial." Brief for appellant at 25. However, the record does not clearly show this alleged error. Michael asserts, referring to a trial exhibit showing the balance for the "original loan on that land" in the names of his business partner and the partner's grandfather, that the monthly payment is $400. Brief for appellant at 25. However, the record does not contain evidence of the actual monthly payment being made on the land at the time of trial and the land loan (outstanding amount of $22,000) had not yet been refinanced in Michael's name. The land payment was being made by Out on a Limb and appears to be for property owned by Out on a Limb and used "as a shop." The exhibit also included $252.23 for a camper loan payment that Michael was personally making at the time of trial, and although he initially asked the court to award him the camper, he later agreed that Stacie could have it.

Michael testified that his expense exhibit accurately reflected what he and his businesses were paying for his "living expenses." Michael marked with an asterisk the "[p]ersonal expenses" listed on the exhibit which were paid "[t]hrough Jolly Green." The expense exhibit shows that expenses being paid by Jolly Green were for cell phone; transportation expenses of car payment/lease, gasoline, repairs, license/taxes, and car insurance; and a camper insurance payment. Other than the land payment, which "comes out of Out on a Limb," Michael testified that he paid the other expenses listed on the expense exhibit through his personal account. The record confirms that some monthly expenses were paid through Michael's businesses both during the parties' marriage and after their separation. Michael testified that the parties purchased a lot of personal items and paid for entertainment through Jolly Green.

Given his claims with respect to his monthly income and living expenses, Michael was asked on cross-examination whether he was "running a shortfall of about $5,000 every month." Michael responded, "No," and agreed that "[a]ll [his] expenses" were being paid. Michael also agreed that he had "cash coming in to pay those expenses of about $88,380 [monthly expenses of $7,365.15 annualized]" from "both the business[es] and [him] personally." The CPA retained by Stacie to determine the cash flow available to Michael reviewed a personal financial statement for Michael and various income tax returns and bank statements. The only complete year of records he reviewed for Jolly Green was 2015. The CPA wanted to be "conservative" in his analysis to give Michael "the benefit of the doubt." With respect to Jolly Green, he adjusted the disbursements for "obvious items that were personal in nature" and found a significant amount of personal expenditures coming out of Jolly Green. In doing so, he adjusted only the disbursements and assumed the receipts deposited were accurate. The CPA estimated that Michael's available cash flow from Jolly Green for 2015 was $23,461.76. For Out on a Limb, he looked at the disbursements and "reduced them for any checks for wages or dividend distributions, assumed the rest was all business and business expenditures." He estimated cash flow from Out on a Limb of $26,231.58 for 2014 and $23,244.42 for $2015. In preparing his analysis, the CPA never spoke with Michael, his former business partner, or his accountant.

After the CPA's testimony, Michael submitted another child support calculation using a total monthly income of $3,892.16.

Stacie has been employed with a company since 2008 where she is currently the creative services manager, responsible for the company's branding and marketing. Stacie worked part time until 2012 when she began working full time in order to receive health insurance and vacation benefits. During the marriage and divorce proceedings, Stacie covered the children and Michael under the health benefits offered through her employer. At the time of trial, Stacie was working Monday through Friday from 8 a.m. to 5 p.m., and she described her hours as "very flexible." She was earning a salary of $65,000 per year.

The parties each agree that the other is a good parent, and the record shows that they communicate well with one another, and are cooperative in terms of parenting. Since the parties separated, the two boys have adjusted to the temporary parenting schedule, are in good health, and are performing well in school. The record also shows that both parties have good relationships with the children.

As noted above, under the pretemporary order parenting time schedule, Michael had the children six overnights during a 2-week period, which decreased to five overnights during the school year once the actual temporary order was entered. On Tuesdays and Thursdays under the pretemporary order summer schedule, Michael would pick the children up from childcare between 4 and 5 p.m. and then return them to their respective childcare facilities the following morning. During Michael's alternating weekends of parenting time, he would return the children to Stacie at 7 p.m. on Sunday. It is not clear from the record whether Michael returned the children earlier on Sundays once the temporary order (which provided that his weekend time ended at 6:30 p.m. on Sunday) went into effect or if he continued to return them at 7 p.m. During the school year, Michael would pick the children up from school or daycare and return them there the next morning when he had overnight parenting time. And, he would return the children to Stacie at 8 p.m. on those Thursdays when he did not have overnight parenting time. Michael indicated that he has adjusted his work schedule so that he does not start work until about 8:30 a.m. on those mornings he takes the children to school and so that he is able to pick them up after work by 5 p.m. He testified that he was never late in dropping the children off for school and that he has never been late or had to rely on someone else to pick them up. Michael has made other accommodations to his work schedule. He has tried to "have help with [him]" to facilitate quicker snow removal and has made the necessary arrangements for the children if he is "called out for work." He testified that before the temporary parenting order, he usually left for work around 7 or 7:30 a.m., returned home by 5 or 6 p.m. most evenings, and worked later mowing one night per week.

Michael asked the court to increase his parenting time by adding a Thursday overnight in the first week of each 2-week period and by adding Sunday overnights to his alternating weekend parenting time, which would give him parenting time on 7 out of every 14 days. He testified to his belief that "50/50" parenting time was in the children's best interests. Michael indicated that Stacie had expressed some concern about "the back-and-forth with the kids" involved in shorter blocks of parenting time. But at trial, when asked by the district court about her preference in the event that the court felt that the parties were "equally fit," she expressed a preference for shorter parenting time periods of "two to three days," as opposed to a week on, week off schedule. Stacie testified that she preferred to keep the same parenting time schedule because the children were

"doing excellent." She felt that keeping the same parenting time schedule would be in the children's best interests.

Stacie requested sole physical custody, testifying that she loves the children, would do anything for them, believes routine is important, and has been "the primary person to give them that routine." Stacie testified that Michael's schedule during the marriage of working long hours had impacted his ability to spend time with the children. She testified that she did not understand how Michael "could have joint [physical] custody given his work schedule" and that she had "always been the one to provide the primary care" for the children.

At the close of trial, the district court noted Michael's testimony that he had changed his work schedule to be more flexible and more available for parenting time. The court addressed Michael's request to add a Thursday overnight of parenting time, stating, "It doesn't make sense to the Court on the Thursday nights when the kids are getting ready for bed . . . that they just don't go to bed at his house." The court also noted that there had been no issues with Michael's timeliness in picking the children up from or returning them to school. The court commended the parties on their parenting and stated that it seemed like "these are two excellent young boys that are growing up great and that both parents should have as much time as possible with the children." The court concluded, "So I think . . . the Sunday night should be an overnight, also, on every other." The court subsequently stated that it was going to award "the Thursday and the Sunday nights every week -- the Thursday every week and the Sunday every other week." When asked to clarify, the court stated, "Tuesday and Thursday nights. The only thing that changes is the Thursday -- one Thursday overnight and Sunday every other overnight."

On July 21, 2017, the district court entered a decree of dissolution, dissolving the parties' marriage and dividing the marital estate. In determining custody and parenting time, the court observed that the children were doing very well academically, socially, and emotionally. The court also found that the parties, who each admitted that the other was a good parent, had adjusted to successfully co-parenting and that Stacie's primary complaint was the long hours worked by Michael due to the nature of his occupation. Accordingly, the court found it in the children's best interests that the parties share joint legal and physical custody, subject to the terms and conditions of the parties' mediated parenting plan and the court's addendum to the parenting plan. The court expanded Michael's parenting time from that awarded in the temporary order. Because both parties were "doing a good job during their parenting time," the court found that extending Michael's parenting time to include every Thursday overnight was in the children's best interests. However, contrary to its statements at the end of trial, the court declined to extend Michael's alternating weekend parenting time to include a Sunday overnight during the school year, only including that additional time requested by Michael in the summer parenting time schedule. The court reasoned:

> As the children have adjusted to starting school on Monday mornings from [Stacie's] custody, that shall remain the same during school months. During the summer months, June and July when the children are out of school, [Michael's] every other Sunday shall be an overnight. The Court also finds this change from the temporary order to be in the best interests of the children.

- 6 -

We do not address the district court's valuation and division the marital estate, except to note that court awarded the parties' camper to Stacie "subject to the encumbrance thereon."

In calculating child support, the district court used a net income for Michael of $7,365 per month, finding as follows:

> Due to the nature of [Michael's] employment, his monthly income calculation was inexact and not fairly represented by his personal income tax returns. As such, the Court could not rely upon [Michael's] tax returns to calculate income for child support purposes. [Michael] admitted that he did not report or deposit his cash receipts and paid personal expenses through his businesses. [Michael] does not run all received checks through his account but cashes them at the bank of the payor to receive cash.
>
> Additionally, [Michael] receives cash for services. Because not all income is reflected in bank deposits, [Michael's] income cannot be calculated directly from bank statements or credit card payments. [Michael] offered . . . his monthly expenses. [Michael] testified that he has [$7,365] available for expenses on a monthly basis. [Michael] was asked specifically about [his monthly expenses] 'Do these truly and accurately reflect what you are paying or Out on a Limb is paying or Jolly Green is playing with respect to your living expenses?', [Michael] responded, 'yes'. The Court can only assume that the money available for these living expenses is net income. [Michael] was clear that his net income covered all the [monthly] expenses . . . and there was no monthly shortage. The Court notes that [Michael] will no longer have expenses associated with [Stacie's] camper and [Michael] significantly overestimated a monthly land payment on [his expense exhibit]. With that in mind, his net income is sufficient to cover his expenses and child support. The Court calculated child support based upon this testimony from [Michael]. . . . Those expenses paid by [Michael's solely owned businesses may be legitimate business deductions[,] but they should still can [sic] be credited to him as income for a child support calculation.

The court ordered Michael to pay child support of $839 per month for two children and $631 for one child. Also, the court found that the parties would each be allowed to claim one minor child as a dependency exemption for tax purposes. When there is only one minor child eligible to be claimed, the parties are to alternate claiming the exemption with Stacie being entitled to claim the minor child the first year there is only one child eligible. The court ordered that Michael must be current on his child support, childcare, and nonreiumbursed health care expenses as of the last day of the tax year in order to be able to claim any of the minor children in any tax year.

Following entry of the decree, Michael and Stacey both filed timely motions to alter or amend. Michael asked the district court to alter or amend the award of parenting time to reflect the court's statements at the conclusion of trial. Michael also asked the court to reconsider its determination of his net monthly income for the purposes of calculating child support. The parties made other requests in their motions not relevant to the issues on appeal. During the hearing on the parties' motions, the court indicated that it had reviewed its statements made at the end of trial and stated that in "mentioning every Thursday and every Sunday" at that point, it misspoke. The court stated further that the award of parenting time in the decree "so that the summertime is

Sundays" was "the appropriate way to do that." After the hearing, the court entered an order, which corrected a typographical error in the decree with respect to the award of a certain retirement account, but it otherwise denied the parties' motions to alter or amend the decree. Michael subsequently perfected his appeal to this court.

## ASSIGNMENTS OF ERROR

Michael asserts that the district court abused its discretion in (1) determining parenting time, (2) denying his motion to alter or amend, (3) calculating child support, and (4) restricting his ability to claim a tax dependency exemption based on factors other than child support.

## STANDARD OF REVIEW

In a marital dissolution action, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge. *Wiedel v. Wiedel*, 300 Neb. 13, 911 N.W.2d 582 (2018). This standard of review applies to the trial court's determinations regarding custody, parenting time, child support, division of property, alimony, and attorney fees. See, *id.*; *Thompson v. Thompson*, 24 Neb. App. 349, 887 N.W.2d 52 (2016). An award of a dependency exemption is reviewed de novo to determine whether the trial court abused its discretion. *Emery v. Moffett*, 269 Neb. 867, 697 N.W.2d 249 (2005).

In a review de novo on the record, an appellate court is required to make independent factual determinations based upon the record, and the court reaches its own independent conclusions with respect to the matters at issue. *Westwood v. Darnell*, 299 Neb. 612, 909 N.W.2d 645 (2018). When evidence is in conflict, the appellate court considers and may give weight to the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another. *Id.*

A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Id.*

A motion to alter or amend a judgment is addressed to the discretion of the trial court, whose decision will be upheld in the absence of an abuse of that discretion. *Lombardo v. Sedlacek*, 299 Neb. 400, 908 N.W.2d 630 (2018).

## ANALYSIS

*Parenting Time.*

Michael asserts that the district court abused its discretion in determining parenting time. He argues that the record does not indicate that he should have less than equal parenting time with the children.

The trial court has discretion to set a reasonable parenting time schedule. *Schmeidler v. Schmeidler*, 25 Neb. App. 802, 912 N.W.2d 278 (2018). The determination of the reasonableness of a parenting plan is to be made on a case-by-case basis. *Id.* Parenting time relates to continuing and fostering the normal parental relationship of the noncustodial parent. *Id.* The best interests of the children are the primary and paramount considerations in determining and modifying parenting time. *Id.*

The best interests of a child require a parenting arrangement which provides for a child's safety, emotional growth, health, stability, and physical care. *Id.* With respect to determining custody and parenting time arrangements, Neb. Rev. Stat. 43-2923(6) (Reissue 2016) provides:

[T]he court shall consider the best interests of the minor child, which shall include, but not be limited to, consideration of . . . :

(a) The relationship of the minor child to each parent prior to the commencement of the action or any subsequent hearing;

(b) The desires and wishes of the minor child, if of an age of comprehension but regardless of chronological age, when such desires and wishes are based on sound reasoning;

(c) The general health, welfare, and social behavior of the minor child;

(d) Credible evidence of abuse inflicted on any family or household member . . . ; and

(e) Credible evidence of child abuse or neglect or domestic intimate partner abuse.

Other pertinent factors include the moral fitness of the child's parents, including sexual conduct; respective environments offered by each parent; the age, sex, and health of the child and parents; the effect on the child as a result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; and parental capacity to provide physical care and satisfy educational needs of the child. *Robb v. Robb*, 268 Neb. 694, 687 N.W.2d 195 (2004).

"Joint physical custody means mutual authority and responsibility of the parents regarding the child's place of residence and the exertion of continuous blocks of parenting time by both parents over the child for significant periods of time." Neb. Rev. Stat. § 43-2922(12) (Reissue 2016). However, Nebraska statutes do not require the district court to grant equal parenting time or joint custody to the parents if such is not in their children's best interests. See *Kamal v. Imroz*, 277 Neb. 116, 759 N.W.2d 914 (2009).

According to the district court's calculation concerning child support using the joint custody worksheet, Michael had custody of the children 160 days of the year, which is less than half of the time. The record shows some dispute over Michael's work schedule, especially prior to the parties' separation, but it is clear that he successfully modified his schedule to comply with the temporary parenting time schedule. It is also clear that the children had adjusted to and were thriving under the temporary schedule. The district court modified this schedule slightly in the decree, adding an additional Thursday overnight with Michael and adding Sunday overnight parenting time to Michael's alternating weekends during the summer, but otherwise maintaining the parenting time schedule set in the temporary order. In declining to add the Sunday overnight parenting time during the school year, the court noted that Michael only had the children on his Sundays until 6:30 p.m., and it reasoned that the children had adjusted to starting school on Monday mornings from Stacie's custody. Upon our de novo review, we find no abuse of discretion in the court's parenting time schedule.

*Motion to Alter or Amend.*

Michael asserts that the district court abused its discretion in denying his motion to alter or amend. Although Michael raised multiple issues in his motion to alter or amend, on appeal, he addresses his arguments to the court's award of parenting time. We have already determined that the court did not abuse its discretion in determining parenting time. Accordingly, we need not address this assignment of error further. An appellate court is not obligated to engage in an analysis that is not necessary to adjudicate the case and controversy before it. *Nesbitt v. Frakes*, 300 Neb. 1, 911 N.W.2d 598 (2018).

*Child Support.*

Michael asserts that the district court abused its discretion in calculating child support. Specifically, he argues that the court erred in calculating his income by failing to credit him for his ordinary and reasonable business expenses.

The Nebraska Child Support Guidelines define total monthly income as "income of both parties derived from all sources." See Neb. Ct. R. § 4-204 (rev. 2015). Income for the purposes of calculating child support is not necessarily synonymous with taxable income. *Marshall v. Marshall*, 298 Neb. 1, 902 N.W.2d 223 (2017). A flexible approach is taken in determining a person's income for purposes of child support, because child support proceedings are, despite the child support guidelines, equitable in nature. *Id.* While a court calculating child support is permitted to add in-kind benefits derived from an employer to a party's income, inclusion of such benefits is not required. *Roberts v. Roberts*, 25 Neb. App. 192, 903 N.W.2d 267 (2017). The paramount concern in child support cases, whether in the original proceeding or subsequent modification, remains the best interests of the child. *Incontro v. Jacobs*, 277 Neb. 275, 761 N.W.2d 551 (2009).

Here, the district court based Michael's income for child support purposes on his ability to pay expenses of $7,365 per month, noting that he would no longer have expenses associated with a camper and that he had overestimated a land payment in his expenses. The court observed that due to the nature of Michael's income, his calculations were not fairly represented by his tax returns and thus the court could not rely upon them in calculating his income for child support purposes.

From our de novo review of the record, we find no abuse of discretion by the trial court in determining Michael's income based upon his representation that he had sufficient income through his businesses to pay the personal living expenses shown on exhibit 57. Although Michael asserts on appeal that the land payment amount shown on this exhibit contains an error, he nevertheless agreed at trial that his annual income was sufficient to specifically cover expenses of $7,365 monthly, or $88,380 annually. We find no abuse of discretion by the trial court in calculating Michael's monthly income at $7,365 for purposes of determining child support.

*Tax Dependency Exemption.*

Michael asserts that the district court abused its discretion in restricting his ability to claim a tax dependency exemption based on factors other than child support. In the decree, the court allocated one tax dependency exemption to each party when there were two minor children and

ordered the parties to alternate claiming the exemption when there was only one minor child. The court specified that in order for Michael to claim any of the minor children in any tax year, he must be current not only on his child support, but also on childcare and nonreimbursed health care expenses as of the last day of the tax year. Michael was ordered to pay 63 percent of all employment related childcare expenses and 63 percent of any nonreimbursed health care expenses.

A state court having jurisdiction in a dissolution action has the power to allocate tax dependency exemptions as part of the dissolution decree. *Fetherkile v. Fetherkile*, 299 Neb. 76, 907 N.W.2d 275 (2018). A tax dependency exemption is nearly identical in nature to an award of child support or alimony. *Id.* In general, the custodial parent is presumptively entitled to the federal tax exemption for a dependent child. *Anderson v. Anderson*, 290 Neb. 530, 861 N.W.2d 113 (2015). But, a court may exercise its equitable powers to allocate the exemption to a noncustodial parent. *Emery v. Moffett*, 269 Neb. 867, 697 N.W.2d 249 (2005). A court may exercise its equitable powers and order the custodial parent to execute a waiver of his or her right to claim the tax exemption for a dependent child if the situation of the parties so requires. *Anderson v. Anderson, supra*. The primary purpose for permitting a trial court to reallocate the exemption is to allow the party paying support to have more disposable income from which to make such payment. *Id.* Allocation of the dependency exemption to the noncustodial parent is not warranted if the parent pays a relatively small amount of child support. *Id.*

Michael acknowledges that it was appropriate for the district court to make his ability to claim a tax dependency exemption contingent upon him being current in his child support payments. See *McDonald v. McDonald*, 21 Neb. App. 535, 840 N.W.2d 573 (2013) (holding that dependency exemption is available to parent who provides support to minor child and if parent is not current, he or she is not supporting minor in way court deemed necessary). However, Michael argues that unlike child support "which is collected, distributed and recorded by the Child Support Payment center," contributions to childcare and nonreimbursed health care expenses are "too discretionary to be considered as a factor in whether [he] has supported his children throughout the year." Brief for appellant at 28. We disagree. The Nebraska Child Support Guidelines provide for parents' proportionate contributions to the payment of both childcare and nonreiumbursed health care expenses. See Neb. Ct. R. §§ 4-214 (rev. 2016) and 4-215 (rev. 2011). Michael's obligation to pay 63 percent of these expenses was provided for in the decree. The district court did not abuse its discretion in making his ability to claim a tax dependency exemption contingent upon him being current in his payment of these obligations as well.

## CONCLUSION

The district court did not abuse its discretion in awarding parenting time, calculating child support, or awarding the tax dependency exemptions. Nor did it abuse its discretion in denying Michael's motion to alter or amend the decree.

AFFIRMED.